**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------x

STEALTH CONSULTING MANAGEMENT, INC.                Case No.:
AND FINTREE HOLDING GROUP,

Plaintiffs,

v.

VIKING DATA CENTERS LLC, WEN XIAO LI,
SOFFIA WATHNE, ANNA BERGLJOT
WATHNE, STEFAN WATHNE, KAZIM TAHIR-
KHELI

Defendants.

-----------------------------------------------------------------x

## COMPLAINT

Plaintiffs Stealth Consulting Management Inc. ("Stealth") and Fintree Holding Group

("Fintree" and collectively, with Stealth, "Plaintiffs") bring this action against Viking Data

Centers, LLC, ("Viking") Wen Xiao Li, Soffia Wathne, Anna Bergljot Wathne, Stefan Wathne,

Kazim Tahir-Kheli ("Kaz" and, collectively, with Viking, Wen Xiao Li, Soffia Wathne, Anna

Bergljot Wathne, Stefan Wathne, the "Defendants") and state as follows:

## PRELIMINARY STATEMENT

1.      The case arises as a result of Defendants' failure to satisfy its obligations under

various contracts with the Plaintiffs.  Specifically, despite Plaintiffs performing all of their

obligations under the agreements, Defendant, despite due demand, has willfully refused to pay the

previously agreed upon compensation and success fee.

## PARTIES

2.      Plaintiff Stealth Consulting Management Inc. is a corporation organized under the

laws of Delaware and has a principal place of business at 4640 Admiralty Way, Suite 500, Marina

Del Rey, CA 90292.

3.      Plaintiff Fintree Holding Group is a corporation organized under the laws of the Country of Australia and has a principal place of business of level 1, 95-97 Grafton St Bondi Junction 2022, NSW Australia.

4.      Defendant Viking Data Centers LLC is a limited liability company organized under the laws of Ohio and has a principal place of business at 428 Seiberling Street, Akron, OH 44306.

5.      Wen Xiao Li is a Chinese national who serves as the *de facto* principal of Viking. Despite his admission that he owns fifty percent of Viking, Wen Xiao Li does not appear on any disclosure forms filed with the U.S. Security Exchange Commission. Wen Xiao Li is an undisclosed beneficial owner of Viking.

6.      Soffia Wathne is an individual who resides in New York, New York and is a director of Viking.  Although she claims to be a director, Soffia makes no decisions on her own and follows the express instructions of her brother Stefan Wathne.

7.      Anna Bergljot Wathne is an individual who resides in New York, New York and is a director of Viking.  Although she claims to be a director, Anna makes no decisions on her own and follows the express instructions of her brother Stefan Wathne.

8.      Stefan Wathne is an individual who lives in China.  Stefan Wathne was indicted in the U/S. District Court, Northern District of California on a charge of conspiracy to commit money laundering.  After being extradited from India, the Court found the extradition procedurally invalid but declined to dismiss the indictment.  He was ordered to leave the United States.  The indictment remains open today.  Stefan Wathne is an undisclosed beneficial owner of Viking.

9.      Kazim Tahir-Kheli is an individual who resides in the State of Florida and is employed by Defendant Viking.

2

**JURISDICTION AND VENUE**

10.     This Court has subject matter jurisdiction in this matter pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between each Plaintiff and the Defendant, and the amount in controversy exceeds $75,000 exclusive of interests and costs.  Diversity of citizenship exists because Plaintiffs are citizens of California and Australia respectively and Defendants are citizens of New York, Ohio, and China.

**BACKGROUND**

11.     Stealth is a boutique business advisory and business development firm.  On August 7, 2025, Stealth and Viking entered into a Letter of Understanding (the "LOU").

12.     Pursuant to the LOU, Viking engaged Stealth to aid it in "expanding its value proposition to a broader client base."

13.     Viking agreed to pay Stealth $10,000 per month for a term of six (6) months.  In addition, Viking agreed to pay Stealth five percent (5%) of all capital introduced as equity and two percent (2%) of all capital introduced as debt into Viking through Stealth.

14.     With respect to the success fee, the LOU stated that Stealth would be entitled to a success fee from any capital which inures to the benefit of Viking within twelve (12) months following the end of the term of the LOU.

15.     The LOU was signed by both Viking and Stealth.

16.     On or about February 1, 2026, Fintree presented to Viking the Capital Raising, Mergers & Acquisitions and Strategic Advisory Agreement (the "Fintree Agreement").

17.     Pursuant to the terms of the Fintree Agreement, Fintree was to provide customary investment banking and brokerage services, which may include without limitation: (i) identifying and introducing prospective investors, lenders, counterparties and acquirers; (ii) advising on structure, process and commercial positioning; (iii) coordinating preparation of marketing

3

materials and data rooms; (iv) managing and coordinating diligence and communications; (v) assisting with negotiations; and (vi) supporting execution through closing.

18.     Thus, while the services performed under the LOU include investor introductions, the Fintree Agreement had evolved to include enterprise sale strategy, M&A advisory, valuation, engineering, advisor selection, and transaction structuring.

19.     In exchange for these services, the Fintree Agreement required Viking to pay a monthly retainer to Fintree in the amount of $10,000 per month until such time as the Fintree Agreement was terminated, but for not less than six (6) months.

20.     In addition, Fintree was entitled to a commission equal to three percent (3%) of the gross principal amount of any debt financing completed and five percent (5%) of the gross proceeds of any equity financing completed.

21.     The Fintree Agreement explicitly noted that the relationship between Fintree and Viking was exclusive and Viking could not appoint any other party to provide substantially similar services.

22.     Like the LOU, the Fintree Agreement provided that Fintree would be entitled to a success fee for any capital that inured to Viking's benefit within twelve (12) months after the agreement's term ended.

23.     On February 11, 2026, nine (9) days after receiving the Fintree Agreement, the LOU expired.

24.     Although the Fintree Agreement was not signed, both parties performed under the agreement as if it had been signed.

**Defendants' Performance Under the Fintree Agreement**

25.     Pursuant to the terms of the Fintree Agreement, Viking was required to pay Fintree

4

a retainer in the amount of $10,000 per month.

26.    Indeed, on January 30, 2026, David Price, Chief Operating Officer of Fintree, sent an invoice to Kaz, the Chief Operating Officer of Viking requesting the initial $10,000 payment under the Fintree Agreement.

27.    Previously, in an e-mail dated January 29, 2026, David Price had stated that Fintree and Viking still had to formally confirm their agreement to move forward under the Fintree Agreement but suggested that Fintree would already issue the invoice for February and that they deal with the formalities later.

28.    In his response dated January 29, 2026, Kaz stated,  "Please go ahead and invoice Angela and I will instruct her to pay. […] Appreciate you working tirelessly in the background on our behalf as we figure out how best to proceed.""

29.    Following this correspondence and the agreed approach to formalize the agreement, on February 1, 2026, Fintree sent a copy of the Fintree Agreement to Viking.

30.    On February 2, 2026, Kaz requested that he and Price schedule a call with Soffia Wathne to "walk through the [Fintree Agreement] and your perspectives on what we should be doing next?"

31.    Throughout the month of February 2026, Price sent emails to Kaz giving his advice related to a potential loan and considering options for the sale of the business.  This advice included, but was not limited to, sale pricing, loan processes and contacts for potential lenders and purchasers.

32.    By February 6, 2026, as a result of Price's consulting advice, Kaz determined that they would move forward with a $3 Million loan to be provided by Initium Capital ("Initium").

33.    Shortly thereafter, Viking sent payment to Fintree in early February 2026.  This

accounted for the February Payment.

34.     Viking also made similar payments to Fintree in March and April 2026.

35.     In March 2026, Price directed Kaz to obtain a board resolution giving him authority to sell the business.  Kaz obtained that resolution on March 16, 2026.

36.     On March 19, 2026, Kaz forwarded various valuation materials and requested Price's thoughts on valuation materials.

37.     Shortly thereafter, Price provided a detailed analysis on Kaz's options and outlined action items that needed to be performed.

38.     In addition, they discussed in detail the differences between possible sales to Cushman and Wakefield and Oberon.  Price advised Kaz to consider Oberon even though the sale process may be a bit longer.

39.     On March 27, 2026, Price sent an email to Kaz.  In that email, he attached a revised Advisory Agreement (the "Revised Fintree Agreement").  According to the email, the Revised Fintree Agreement was prepared as a result of discussions between Price and Kaz.

40.     In that same email, Price acknowledged that the Fintree Agreement was not formally signed by Viking, but Fintree had been "proceeding on the basis of those terms."

41.     In response to that email with respect to the Revised Fintree Agreement, Price received no response.

42.     At no time did Viking state that Price should not be proceeding under the terms of the Fintree Agreement.  Indeed, Viking requested revisions to the Fintree Agreement.

43.     Rather than reject either the Fintree Agreement or the Revised Fintree Agreement, on March 30, 2026, Price sent an invoice requesting the Monthly Retainer described in the Revised Fintree Agreement.

44. Shortly thereafter, Viking acknowledged receipt of the invoice.

45. The following day, March 31, 2026, Viking paid the invoice in compliance with the terms of the Revised Fintree Agreement.

46. Throughout the month of April 2026, there were more calls and advice provided to Viking relating to possible loans and potential sales. All of these services were provided pursuant to the Fintree Agreement or the Revised Fintree Agreement.

47. On April 25, 2026, Viking instructed Fintree to continue its work related to Initium.

48. On or about April 26, 2026, Fintree discovered that there was pending an imminent sale of Viking to be facilitated by Cushman and Wakefield for $300,000,000.

49. On April 28, 2026, Fintree delivered a written summary covering the following: (i) progression of the engagement; (ii) expanded scope; (iii) work performed; (iv) transaction strategy; and (v) path forward.

50. On May 1, 2026, Fintree delivered additional advisory work product which Viking accepted and retained.

51. For the first time since presenting the Fintree Agreement to Viking, on May 1, 2026, Viking failed to honor a monthly retainer payment despite paying those monthly retainer payments in February 2026, March 2026, and April 2026.

52. Finally, on May 1, 2026, Deepak Shastri, Chief Financial Officer of Fintree, and Kaz had a call wherein Kaz admitted that a contract existed between Viking and Fintree from the moment he paid the retainer in February 2026.

53. During that same call, Kaz admitted that Viking decided not to pay the May 2026 monthly payment because it would have been damaging to its legal position.

54. Upon learning of Viking's attitude, Fintree wanted to know exactly who they were

7

dealing with.

55. With a minimal amount of research, the curtain lifted on the misdeeds of the heart of Viking including Stefan Wathne's indictment, Soffia's SEC violations, and the hidden Chinese partner Wen Xiao Li.

56. Having learned these facts, a fuller and more nefarious picture of Viking developed.

<u>**COUNT I – BREACH OF CONTRACT**</u>

57. Plaintiffs hereby incorporate by reference allegations in paragraphs 1-55 as if fully set forth herein.

58. Fintree and Viking entered into a valid and binding contract, specifically the Fintree Agreement.

59. Fintree performed any and all conditions precedent and obligations for which they are seeking payment under the Fintree Agreement.

60. Viking is indebted to Plaintiffs for services rendered under the Fintree Agreement in the amount of $3,060,000 which includes $60,000 for missing retainer payments and $3,000,000 for the promised 1% success fee.

61. Viking is indebted to Stealth in the amount of $15,000,000 for the 5% success fee as a result of the tail language in the LOU.

62. Despite due demand, Viking has failed and refused to pay either Stealth or Fintree.

63. Plaintiffs have been damaged by Viking's failure to pay.

<u>**COUNT II – QUANTUM MERUIT**</u>

64. Plaintiffs hereby incorporate by reference allegations in paragraphs 1-62 as if fully set forth herein.

65. In addition, during and before the pendency of the payment agreement and at the special insistence and request of Viking, Plaintiffs in good faith provided certain services to Viking

as detailed above.

66.    Viking freely accepted those services.

67.    Plaintiffs reasonably expected to receive compensation from Viking for those services.

68.    The reasonable value of those services is $18,060,000 in the aggregate.

69.    Although Plaintiffs have demanded payment, Viking has failed and refused to pay such sum and the amount remains unpaid.

70.    Plaintiffs have been damaged by Viking's failure to pay.

<strong><u>COUNT III – UNJUST ENRICHMENT</u></strong>

71.    Plaintiffs hereby incorporate by reference herein the allegations contained in paragraphs 1-69 as if more fully set forth herein.

72.    In addition, during and before the pendency of the Fintree Agreement and at the special insistence and request of Viking (and to its benefit), Plaintiffs provided services to Viking as described above.

73.    Under these circumstances, equity and good conscience demand that Viking give restitution for its receipt of the benefits that Plaintiffs conferred upon Viking in the amount of the reasonable value of the services.

74.    The reasonable value of those services is $18,060,000.

75.    Although Plaintiffs have demanded payment, Viking has failed and refused to pay such sum and the amount remains unpaid.

76.    Plaintiffs have been damaged by Viking's failure to pay.

<strong><u>COUNT IV – PROMISSORY ESTOPPEL</u></strong>

77.    Plaintiffs hereby incorporate by reference herein the allegations contained in paragraphs 1-65 as if more fully set forth herein.

9

78.     Defendant made a clear and unambiguous promise to pay Plaintiffs for their services pursuant to the Fintree Agreement.

79.     Defendant reasonably expected Plaintiffs to rely on this promise, and Plaintiffs did reasonably and detrimentally rely on it by spending months performing work.

80.     Injustice can only be avoided by the enforcement of the Defendants' promise.

### COUNT V – FRAUDULENT MISREPRESENTATION

81.     .Plaintiffs hereby incorporate by reference herein the allegations contained in paragraphs 1-79 as if more fully set forth herein.

82.     Defendants made many false misrepresentations including, but not limited to, the failure to disclose that indicted Stefan Wathne was actually in charge of Viking, that a Chinese national was a majority shareholder, and Soffia Wathne's filing of false documents with the SEC.

83.     Defendants represented Viking as a law-abiding company, which it was not.

84.     Defendants knew that Viking was not a law-abiding company and it intended to mislead Plaintiffs.

85.     Plaintiffs were justified in relying on these misrepresentations.

86.     Plaintiffs had a right to rely on these misrepresentations.

87.     As a result of Defendants' fraudulent conduct, Plaintiffs could not have seen the full scope of the risk that Defendants would demand services from the Plaintiffs and refuse Defendants request for payment under the LOU and the Fintree Agreement.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs hereby demand judgment in their favor and against Defendant as follows:

a. For compensatory damages in the amount of $18,060,000 for Viking's breach of the LOU and Fintree Agreement;

10

b.  For compensatory damages in the amount of $18,060,000 for damages in connection with *quantum meruit* or unjust enrichment;

c.  An award of Plaintiffs' costs and reasonable attorneys' fees; and

d.  For such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues so triable as of right.

Dated:  June 23, 2026                    **TODD E. DUFFY, PLLC**

*/s/Todd E. Duffy*
Todd E. Duffy
132 West 31st Street
9th Floor
New York, NY
10001 Telephone:
(212) 729-5832
E-mail: todd@teduffylaw.com


*Counsel for the Plaintiffs*

11