**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------------x

STEALTH CONSULTING MANAGEMENT, INC. AND FINTREE HOLDING GROUP,

Plaintiffs,

v.

VIKING DATA CENTERS LLC, WEN XIAO LI, SOFFIA WATHNE, ANNA BERGLJOT WATHNE, STEFAN WATHNE, KAZIM TAHIR-KHELI,

Defendants.

--------------------------------------------------------------x

Case No.: 1:26-cv-05296-CM

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE COMPLAINT IN ITS ENTIRETY**

K&L GATES LLP
599 Lexington Avenue
New York, New York 10022
Telephone: (212) 536-3900

*Attorneys for Defendants*

## TABLE OF CONTENTS


Page

PRELIMINARY STATEMENT ... 1

I. THE COMPLAINT'S ALLEGATIONS ... 2

A. The Parties ... 2

B. The Letter of Understanding ... 3

C. Fintree Proposes the Unexecuted Capital Raising, Mergers & Acquisitions and Strategic Advisory Agreement ... 5

D. Despite Being Unsigned by Viking, Plaintiffs Allege that the February Draft is Binding ... 6

E. The Unexecuted March Draft of the Capital Raising, Mergers & Acquisitions and Strategic Advisory Agreement ... 6

F. Plaintiffs Do Not Allege That Viking Was Sold ... 7

II. ARGUMENT ... 7

A. The Court Lacks Subject Matter Jurisdiction ... 7

B. The Court Lacks Personal Jurisdiction Over the Non-New York Defendants ... 9

1. The Complaint does not allege general jurisdiction ... 9

2. The Complaint does not allege specific jurisdiction ... 10

3. Even if Plaintiffs alleged personal jurisdiction, exercising jurisdiction would offend due process ... 11

C. The Complaint Fails to State a Claim ... 12

1. Ohio law governs this dispute ... 12

2. No claim is adequately pled against the Individual Defendants ... 14

3. The Complaint fails to state a breach of contract claim (Count I) ... 15

a. The Complaint does not plead facts establishing that a Consulting Success Fee became due under the LOU ... 16

b. The Complaint does not allege that Viking consented to the Draft Fintree Agreements ... 17

c. The Complaint does not allege a meeting of the minds ................ 20

4. Counts II and III fail to state a claim for quantum meruit and unjust enrichment .......... 21

5. Count IV fails to state a claim for promissory estoppel ............................ 23

6. Count V fails to state a claim for fraudulent misrepresentation ............... 24

CONCLUSION .......... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Addison Holdings, LLC v. Fox, Byrd & Co.*,
203 N.E.3d 1259 (Oh. Ct. App. 2022) ....................................................................25

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)................................................................................................12

*Assemblage Entertainment Pvt. Ltd. v. 41 Entertainment, LLC*,
2025 WL 2776657 (D. Conn. Sept. 29, 2025) ........................................................23

*Atuahene v. City of Hartford*,
10 F. App'x 33 (2d Cir. 2001) .........................................................................15, 25

*Avant Cap. Partners, LLC v. W108 Dev. LLC*,
387 F. Supp. 3d 320 (S.D.N.Y. 2016)........................................................................8

*Barrett v. Forest Labs., Inc.*,
39 F. Supp. 3d 407 (S.D.N.Y. 2014).........................................................................20

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)...........................................................................................12, 23

*Bless v. HomeWAV, LLC*,
--- N.E.3d ---, 2026 WL 1379759 (Oh. Ct. App. 2026).............................................24

*Cary Oil Co. v. MG Ref. & Mktg., Inc.*,
90 F. Supp. 2d 401 (S.D.N.Y. 2000).......................................................................3, 12

*Dailey v. Craigmyle & Sons Farms*, L.L.C.,
894 N.E.2d 1301 (Oh. Ct. App. 2008) ....................................................................23

*Edwards v. Sequoia Fund, Inc.*,
938 F.3d 8 (2d Cir. 2019)...................................................................................23, 24

*Hairston v. Goodman*,
1991 WL 39715 (Oh. Ct. App. Mar. 21, 1991) ..................................................19, 20

*Handelsman v. Bedford Vill. Assocs. Ltd. P'ship*,
213 F.3d 48 (2d Cir. 2000)...........................................................................................7

*Hutton v. Priddy's Auction Galleries, Inc.*,
275 F. Supp. 2d 428 (S.D.N.Y. 2003)..........................................................................9

*IMAX Corp. v. The Essel Grp.*,
154 A.D.3d 464 (1st Dep't 2017) ....................9, 10

*Int'l Minerals & Res., S.A. v. Pappas*,
96 F.3d 586 (2d Cir. 1996)....................13

*KPP III CCT LLC v. Douglas Dev. Corp.*,
222 A.D.3d 408 (1st Dep't 2023) ....................10

*Lawson v. Full Tilt Poker Ltd.*,
930 F. Supp. 2d 476 (S.D.N.Y. 2013)....................11

*Licci v. Lebanese Canadian Bank, SAL*,
673 F.3d 50 (2d Cir. 2012)....................9, 10

*Makarova v. United States*,
201 F.3d 110 (2d Cir. 2000)....................7

*McSweeney v. Jackson*,
691 N.E.2d 303 (Oh. Ct. App. 1996) ....................17, 19

*Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.*,
84 F.3d 560 (2d Cir. 1996)....................12

*Nilavar v. Osborn*,
738 N.E.2d 1271 (Oh. Ct. App. 2000) ....................19

*Penguin Grp. (USA) Inc. v. Am. Buddha*,
609 F.3d 30 (2d Cir. 2010)....................9

*Philips Credit Corp. v. Regent Health Group, Inc.*,
953 F. Supp. 482 (S.D.N.Y. 1997) ....................13

*Pilkington North America, Inc. v. Mitsui Sumitomo Ins. Co. of Am.*,
420 F. Supp. 3d 123 (S.D.N.Y. 2019)....................25

*Profeta v. Shandell, Blitz, Blitz*,
2015 WL 7288651 (S.D.N.Y. Nov. 16, 2015) ....................16

*Rombach v. Chang*,
355 F.3d 165 (2d Cir. 2004)....................24

*SOS Capital v. Recycling Paper Partners of PA, LLC*,
220 A.D.3d 25 (1st Dep't 2023) ....................11

*Sty-Lite Co. v. Eminent Sportswear Inc.*,
115 F. Supp. 2d 394 (S.D.N.Y. 2000)....................9

*Subaru Distribs. Corp. v. Subaru of Am., Inc.*,
425 F.3d 119 (2d Cir. 2005)....................3

*Three-C Body Shops, Inc. v. Nationwide Mutual Fire Ins. Co.*,
81 N.E.3d 499 (Oh. Ct. App. 2017)....................16, 21, 22

*TruLogic, Inc. v. General Electric Co.*,
177 N.E.3d 615 (Oh. Ct. App. 2021)....................21

*Verzani v. Costco Wholesale Corp.*,
641 F. Supp. 2d 291 (S.D.N.Y. 2009)....................12, 13

*Weckel v. Cole + Russel Architects, Inc.*,
255 N.E.3d 221 (Oh. Ct. App. 2024)....................16

*Williams v. U.S. Bank Shaker Square*,
2008 WL 802523 (Oh. Ct. App. Mar. 27, 2008)....................24

*Wisconsin Dept. of Corr. v. Schacht*,
524 U.S. 381 (1998)....................8

*Wynston Hill Cap., LLC v. Crane*,
620 F. Supp. 3d 540 (S.D.N.Y. 2022)....................7

*Young v. Glaze*,
643 N.E.2d 186 (Oh. Mun. Ct. 1994)....................18

**Statutes**

28 U.S.C. § 1332....................7

N.Y. Gen. Oblig. Law § 5-701(a)(10)....................13

Ohio Rev. Code § 1335.05....................13

**Rules**

CPLR 301....................1

CPLR 302(a)(1)....................10

CPLR 302(a)(2)....................11

CPLR 302(a)(3)....................11

Fed. R. Civ. P. 8....................15

Fed. R. Civ. P. 9....................24

Fed. R. Civ. P. 12(b)(1)....................................................................................................1, 9

Fed. R. Civ. P. 12(b)(2)........................................................................................................1

Fed. R. Civ. P. 12(b)(6)..............................................................................................1, 2, 12, 25

Defendants Viking Data Centers LLC ("Viking"), and Wen Xiao Li ("Li"), Soffia Wathne, Anna Bergljot Wathne, Stefan Wathne, and Kazim Tahir-Kheli ("Tahir-Kheli") (collectively, the "Individual Defendants," and together with Viking, the "Defendants") respectfully submit this memorandum of law in support of Defendants' motion to dismiss the Complaint filed by plaintiffs Stealth Consulting Management, Inc. ("Stealth") and Fintree Holding Group ("Fintree") (collectively, the "Plaintiffs") pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(2), and/or 12(b)(6), with the fraud claim (Count V) also failing to satisfy the pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

This action should be dismissed at the threshold. Plaintiffs invoke diversity jurisdiction, yet the Complaint does not identify the citizenship of any member of Viking. That omission alone fails to carry Plaintiffs' burden to plead diversity jurisdiction. Nor can they. The jurisdictional facts established by the accompanying declaration of Soffia Wathne, a named defendant and the sole manager of Viking, confirm that Viking shares Delaware citizenship with Stealth; complete diversity is thus absent. Further, the Complaint alleges that Fintree is a corporation organized under the laws of Australia with its principal place of business in Australia, and that Mr. Li, a defendant, is a Chinese national. A foreign plaintiff and foreign defendant also defeat diversity jurisdiction.

The Complaint further does not plead personal jurisdiction over Viking or Messrs. Li, Stefan Wathne, or Tahir-Kheli (the "non-New York Defendants"). It alleges no New York-directed conduct by the non-New York Defendants giving rise to any claim. The allegation that Mr. Tahir-Kheli requested a call between one of Fintree's representatives and Soffia Wathne to walk through a draft agreement does not establish general jurisdiction, transaction-of-business jurisdiction, a New York tort, or a New York injury within the meaning of CPLR 301 or 302.

If the Court reaches the merits, the Complaint still fails to state a viable claim. Plaintiffs' claims arise from proposed advisory arrangements under which they seek more than $18 million in compensation, principally based on a purportedly "imminent" $300 million sale of Viking. Yet the Complaint does not allege that any such sale closed, that any transaction-based compensation became due, or that Stealth introduced the capital source or counterparty that allegedly triggered a fee under its Letter of Understanding or any other agreement. The Complaint instead describes only a purportedly "imminent" transaction. The pleaded allegations therefore do not establish an accrued right to the claimed success fees.

The separate draft Fintree agreements that Plaintiffs seek to enforce were admittedly never executed by Viking, and the Complaint does not plausibly identify a definite, mutually accepted transaction-fee term or an agreement under which the claimed fee became due. Plaintiffs' quasi-contract claims do not cure these defects because they do not plausibly allege that services with a reasonable value of over $18 million were retained without payment. Finally, the fraud claim (Count V) does not identify any speaker, statement, time, place, reliance, duty to disclose, or injury distinct from the alleged contract damages. It fails both Rule 9(b) and Rule 12(b)(6) of the Federal Rules of Civil Procedure and should be dismissed.

## I. THE COMPLAINT'S ALLEGATIONS

### A. The Parties

Stealth is a boutique business advisory and business development firm organized under the laws of Delaware, with a principal place of business in California. (Compl. ¶¶ 2, 11). Fintree is a corporation organized under the laws of Australia, with a principal place of business in Australia. (*Id.* ¶ 3). Despite being a named plaintiff and the entity who purportedly entered into the (unexecuted) draft Fintree agreements relevant to this dispute (defined below), Plaintiffs do not

allege what business Fintree conducts. David Price is the Chief Operative Officer of Fintree, and Deepak Shastri is its Chief Financial Officer. (*Id.* ¶¶ 26, 52).

Mr. Li is alleged to be a Chinese national. (*Id.* ¶ 5). Stefan Wathne is alleged to live in China. (*Id.* ¶ 8). Messrs. Li and Wathne are alleged to be undisclosed beneficial owners of Viking. (*Id.* ¶¶ 5, 8). Mr. Tahir-Kheli is alleged to reside in Florida and to serve as the Chief Operating Officer of Viking. (*Id.* ¶¶ 9, 26). Soffia Wathne and Anna Bergljot Wathne are alleged to reside in New York, New York and to serve as directors of Viking. (*Id.* ¶¶ 6–7).

Viking owns and operates a large data center facility in Ohio. Plaintiffs allege that Viking is a limited liability company organized under the laws of Ohio and has a principal place of business in Ohio. (*Id.* ¶ 4). However, Plaintiffs do not allege the members of Viking, despite being required to do so to establish diversity jurisdiction. For the reasons addressed in Section II.A, *infra*, this is ultimately fatal, as Viking and Stealth are both citizens of Delaware.

### B. The Letter of Understanding

Plaintiffs allege that, on August 7, 2025, Stealth and Viking entered into a Letter of Understanding ("LOU"). (Compl. ¶ 11). A true and correct copy of the LOU, dated August 11, 2025, is attached to the Declaration of Soffia Wathne ("Wathne Decl.") as Exhibit A.[1] Fintree is not a party to the LOU.

The LOU "outlines the salient points with respect to Advisory and Consulting Services" to be rendered by Stealth. (Ex. A). Stealth agrees to assist with investor presentation coaching and to "facilitate strategic investor introductions with the stated goal of securing the amount of Forty

[1] "In determining the adequacy of the complaint, the court may consider any written instrument attached to the complaint as an exhibit or incorporated in the complaint by reference, as well as documents upon which the complaint relies and which are integral to the complaint." *Subaru Distribs. Corp. v. Subaru of Am., Inc.*, 425 F.3d 119, 122 (2d Cir. 2005); *see also Cary Oil Co. v. MG Ref. & Mktg., Inc.*, 90 F. Supp. 2d 401, 407 n.19 (S.D.N.Y. 2000) (considering contract incorporated by reference into complaint which alleged breach of contract).

Million USD ($40,000,000)" in the form of equity, debt, or a combination of equity and debt. (*Id.*, §§ 1.3, 1.3.1). In consideration for Stealth discharging its duties under the LOU, Stealth is entitled to a $10,000 "Monthly Consulting Fee" each month "for a **term of six (6) months**" (the "Engagement Term"). (*Id.*, § 2.2(i) (emphasis in original)). The Monthly Consulting Fee is to be paid to Stealth via wire transfer "unless the Parties agree to an alternative method of effectuating payment." (*Id.*).

Under the LOU, Stealth is to be paid five percent (5%) of all capital introduced through Stealth to Viking as equity, and two percent (2%) of all capital introduced through Stealth to Viking as debt (the so-called "Consulting Success Fee"). (Ex. A, § 2.2(ii)). Additionally, Stealth is entitled to the Consulting Success Fee from any capital "which inures to the benefit" of Viking within twelve months following the end of the Engagement Term (the "First Tail Period"). (Section 2.2(iii)). Critically, the LOU specifically provides that should Viking "procure investor capital from relationships that have been independently cultivated by [Viking], and not directly/indirectly resulting from introductions made by [Stealth], Viking [sic] shall not be obligated to the Consulting Success Fee." (*Id.*, § 2.2(v)). Finally, the LOU provides that "[w]hile this LOU shall be binding and enforceable by and between the Parties, the Parties agree that the LOU may be superseded by a long form agreement based on substantially the same terms and conditions contained in this LOU." (*Id.*, § 3).

In short, under the LOU, from August 11, 2025 through February 11, 2026 (the Engagement Term), and then through February 11, 2027 (the First Tail Period), Stealth is entitled to a Consulting Success Fee in the event Viking raises capital as equity or debt through Stealth's introductions. However, under the plain terms of the LOU, Stealth is not entitled to any Consulting Success Fee in the event of Viking's sale.

### C. Fintree Proposes the Unexecuted Capital Raising, Mergers & Acquisitions and Strategic Advisory Agreement

Plaintiffs allege that, on or about February 1, 2026, Fintree presented to Viking the Capital Raising, Mergers & Acquisitions and Strategic Advisory Agreement. (Compl. ¶ 16). This was the first of two drafts of that agreement. The first draft dated February 2, 2026 (the "February Draft"), purports to be between Fintree and Viking; Stealth is not an identified party. A true and correct copy of the February Draft is attached to the Wathne Declaration as Exhibit B. The February Draft was never signed by Viking. (Compl. ¶ 24).

The unexecuted February Draft purportedly governs in the event of a potential "Transaction," which includes any debt financing, equity financing, sale of Viking, or acquisition involving Viking. (Ex. B, § 1). It contemplates that Fintree will provide customary investment banking and brokerage services, including identifying and introducing prospective acquirers, assisting with negotiations, and supporting execution through closing. (*Id.*, § 2.2).

The unexecuted February Draft proposes that Viking will pay Fintree a monthly retainer of $10,000, for a minimum of six months. (Ex. B, §§ 3.2, 4.1). Further, Fintree is to be "entitled to a commission equal to five percent (5%) of the total consideration or enterprise value … paid or deemed paid in connection with" a sale of Viking. (*Id.*, § 5.3). Additionally, under the proposed "Commission Framework":

> Fintree shall use commercially reasonable best endeavors to ensure that aggregate commissions payable to all parties do not exceed five percent (5%) of Transaction value. Notwithstanding the foregoing, Fintree shall in all circumstances receive not less than two percent (2%) of Transaction value. Where a required Co-Broker will not proceed for an aggregate commission of 5% or less, Viking agrees that aggregate commissions may increase up to a maximum of seven percent (7%), provided Fintree receives its minimum entitlement.

(*Id.*, § 6.2).

### D. Despite Being Unsigned by Viking, Plaintiffs Allege that the February Draft is Binding

The Complaint acknowledges that Viking never signed the February Draft. (Compl. ¶ 24). Despite this, Plaintiffs claim that "both parties performed under the agreement as if it had been signed." (*Id.*). In support of this conclusion, Plaintiffs assert that Viking paid the monthly retainer fees under the February Draft for the months of February, March, and April 2026. (Compl. ¶¶ 25–34). But the remainder of the Complaint tells a different story.

Plaintiffs allege that, in early February (while the LOU was still operative), Viking "determined that they would move forward with a $3 Million loan to be provided by Initium Capital." (Compl. ¶ 32). And "[s]hortly thereafter, Viking sent [the purported February retainer] payment to Fintree in early February 2026." (*Id.* ¶ 33). Plaintiffs then allege that "[t]hroughout the month of April 2026, there were more calls and advice provided to Viking relating to possible loans and potential sales." (*Id.* ¶ 46). And "[o]n April 25, 2026, Viking instructed Fintree to continue its work related to" the potential loan from Initium Capital. (*Id.* ¶ 47). Plaintiffs assert that Viking then paid Fintree the $10,000 retainer in March and again in April. (*Id.* ¶ 51). However, at the end of April, only after "Fintree ***discovered*** that there was pending an imminent sale of Viking," Fintree "delivered a written summary" purportedly covering the "expanded scope" of its engagement, "transaction strategy, and "path forward." (*Id.* ¶ 48–49 (emphasis added)). Viking did not pay Fintree $10,000 in May. (*Id.* ¶ 51).

### E. The Unexecuted March Draft of the Capital Raising, Mergers & Acquisitions and Strategic Advisory Agreement

The Complaint contains further allegations that demonstrate the February Draft was never agreed to by Viking. Specifically, Plaintiffs allege that, on March 27, 2026, they sent an email to Viking attaching a revised Capital Raising, Mergers & Acquisitions and Strategic Advisory Agreement (the "March Draft," and together with the February Draft, the "Draft Fintree

Agreements"). (Compl. ¶ 39). A true and correct copy of the March Draft is attached to the Wathne Declaration as Exhibit C. The March Draft is similar to the February Draft. However, and importantly, the two drafts (both unsigned by Viking) are materially different with respect to the proposed Commission Framework:

> Fintree shall use commercially reasonable best endeavors to ensure that aggregate commissions payable to all parties do not exceed five percent (5%) of Transaction value. Notwithstanding the foregoing, Fintree shall in all circumstances receive not less than **two percent (1%)** [sic] of Transaction value. Where a required Co-Broker will not proceed for an aggregate commission of 5% or less, Viking agrees that aggregate commissions may increase up to a maximum of **seven percent (6%)** [sic], provided Fintree receives its minimum entitlement.

(Ex. C, § 6.2 (emphasis added)).

### F. Plaintiffs Do Not Allege That Viking Was Sold

As noted, only *after* "Fintree discovered that there was pending an imminent sale of Viking," Fintree "delivered a written summary" purportedly covering the "expanded scope" of its engagement, "transaction strategy, and "path forward." (Compl. ¶¶ 48–49). Plaintiffs do not allege that the proposed transaction has closed. Nor could they. (*See* Wathne Decl. ¶ 12).

## II. ARGUMENT

### A. The Court Lacks Subject Matter Jurisdiction

A plaintiff invoking federal diversity jurisdiction bears the burden of pleading facts sufficient to establish complete diversity. 28 U.S.C. § 1332; *see Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). Plaintiffs have not met that burden.

For purposes of diversity jurisdiction, an LLC is a citizen of every state in which any of its members is a citizen. *Handelsman v. Bedford Vill. Assocs. Ltd. P'ship*, 213 F.3d 48, 51–52 (2d Cir. 2000). Accordingly, "[i]n pleading an LLC's citizenship, the identity and citizenship of each member has to be specifically alleged." *Wynston Hill Cap., LLC v. Crane*, 620 F. Supp. 3d 540, 545 (S.D.N.Y. 2022). Allegations concerning only an LLC's state of formation or principal place

of business are insufficient. *See Avant Cap. Partners, LLC v. W108 Dev. LLC*, 387 F. Supp. 3d 320, 322 (S.D.N.Y. 2016).

The Complaint fails this basic requirement. It alleges only that Viking is organized under the laws of a particular state and maintains its principal place of business in a particular location. (Compl. ¶ 4). It does not identify a single member of Viking, much less allege the citizenship of each member as required to establish diversity jurisdiction. On that basis alone, the Complaint fails to adequately plead subject matter jurisdiction.

The jurisdictional defect is not merely technical. The facts establish that complete diversity does not exist. As set forth in the Wathne Declaration, Viking is wholly owned by Wathne Viking LLC, which is wholly owned by Ingleton USA, Inc. (Wathne Decl. ¶¶ 7, 9). Ingleton USA, Inc. is incorporated in Delaware. (*Id.* ¶ 10). Because the citizenship of an LLC includes the citizenship of its corporate members, Viking is a citizen of Delaware for diversity purposes. *See Avant Cap. Partners*, 387 F. Supp. 3d at 322.

Plaintiff Stealth is likewise incorporated in Delaware and has its principal place of business in California. Stealth is therefore a citizen of Delaware and California. *See* 28 U.S.C. § 1332(c)(1). Because both Stealth and Viking are Delaware citizens, complete diversity is absent as a matter of law. *See Wisconsin Dept. of Corr. v. Schacht*, 524 U.S. 381, 388 (1998) ("A case falls within the federal district court's 'original' diversity 'jurisdiction' only if diversity of citizenship among the parties is complete, *i.e.*, only if there is no plaintiff and no defendant who are citizens of the same State."). The Court therefore lacks subject matter jurisdiction.

There is an independent jurisdictional defect as well. Plaintiffs allege that Fintree is an Australian company with its principal place of business in Australia, and that Mr. Li, a defendant, is a Chinese national. (Compl. ¶¶ 3, 5). Where aliens appear on both sides of a dispute, diversity

jurisdiction is destroyed. *See Sty-Lite Co. v. Eminent Sportswear Inc.*, 115 F. Supp. 2d 394, 399 (S.D.N.Y. 2000). Thus, even apart from the shared Delaware citizenship of Stealth and Viking, Plaintiffs' own allegations foreclose diversity jurisdiction.

In short, Plaintiffs have neither adequately pled nor established complete diversity. Because the absence of subject matter jurisdiction is apparent from both the Complaint and the undisputed jurisdictional facts, the Complaint must be dismissed pursuant to Rule 12(b)(1).

**B. The Court Lacks Personal Jurisdiction Over the Non-New York Defendants**

The Complaint should also be dismissed as against Viking and Messrs. Li, Wathne, and Tahir-Kheli *(i.e.*, the non-New York Defendants) because Plaintiffs have failed to establish any basis for the exercise of personal jurisdiction.

Plaintiffs bear the burden of making a prima facie showing of personal jurisdiction as to each of the non-New York Defendants. *See Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34–35 (2d Cir. 2010); *Hutton v. Priddy's Auction Galleries, Inc.*, 275 F. Supp. 2d 428, 435 (S.D.N.Y. 2003). In a diversity action, the Court must determine first whether New York law authorizes jurisdiction and, if so, whether exercising jurisdiction comports with due process. *See Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 59 (2d Cir. 2012). Plaintiffs fail at the threshold step. The Complaint alleges no facts establishing either general or specific jurisdiction over the non-New York Defendants.

**1. The Complaint does not allege general jurisdiction**

General jurisdiction exists only where a defendant is "at home" in the forum. For individuals, that ordinarily means domicile; for business entities, it generally means the place of incorporation and principal place of business. *See IMAX Corp. v. The Essel Grp.*, 154 A.D.3d 464, 466–67 (1st Dep't 2017).

The Complaint affirmatively forecloses any finding of general jurisdiction. Plaintiffs allege that Viking is an Ohio LLC with its principal place of business in Ohio. (Compl. ¶ 4). They further allege that Mr. Tahir-Kheli resides in Florida and that Messrs. Li and Wathne reside in China. (Compl. ¶¶ 5, 8–9). Having pleaded that none of these defendants are domiciled in New York and that Viking is not headquartered here, Plaintiffs identify no exceptional circumstances that could render any of them essentially "at home" in New York. Nor do they allege any continuous and systematic contacts remotely approaching the demanding standard required for general jurisdiction. *See KPP III CCT LLC v. Douglas Dev. Corp.*, 222 A.D.3d 408, 408 (1st Dep't 2023); *IMAX*, 154 A.D.3d at 466–67. General jurisdiction is therefore absent.

### 2. The Complaint does not allege specific jurisdiction

Unable to establish general jurisdiction, Plaintiffs fare no better under New York's long-arm statute. CPLR 302 requires a concrete connection between a defendant's purposeful New York conduct and the claims asserted. The Complaint alleges none.

Under CPLR 302(a)(1), a plaintiff must show both that the defendant transacted business in New York and that the claims arise from those New York transactions. *See Licci*, 673 F.3d at 60–61. The Complaint alleges neither. According to Plaintiffs' own allegations, the relevant business concerned Viking's Ohio data-center operations and discussions regarding financing and a potential sale of that business. The Complaint places Viking in Ohio, Messrs. Li and Wathne in China, and Mr. Tahir-Kheli in Florida. (Compl. ¶¶ 4-5, 8–9). It identifies no New York negotiations, meetings, agreements, payments, performance, property, or business transactions involving any of these defendants.

The lone allegation that Mr. Tahir-Kheli suggested a call with a representative of Fintree and Soffia Wathne regarding a proposed agreement (Compl. ¶ 30) is plainly insufficient. Even if

the Fintree representative was in New York (though there is no allegation that he was), a request for a call does not constitute the purposeful transaction of business in New York, nor does it establish the requisite nexus between any alleged New York activity and Plaintiffs' contract, quasi-contract, promissory estoppel, or fraud claims.

Nor can Plaintiffs rely on CPLR 302(a)(2). That provision requires the commission of a tort while the defendant is physically present in New York. *See SOS Capital v. Recycling Paper Partners of PA, LLC*, 220 A.D.3d 25, 33 (1st Dep't 2023). The Complaint contains no allegation that Viking or Messrs. Li, Wathne, or Tahir-Kheli committed any tortious act in New York, let alone while physically present here. Its conclusory fraud allegations likewise identify no misrepresentation, speaker, or conduct occurring in New York.

CPLR 302(a)(3) is equally inapplicable. That provision requires, among other things, an out-of-state tort causing injury in New York and circumstances demonstrating that the defendant could reasonably foresee consequences in New York. *See Lawson v. Full Tilt Poker Ltd.*, 930 F. Supp. 2d 476, 484 (S.D.N.Y. 2013). Yet Plaintiffs allege that Stealth is a Delaware corporation that is headquartered in California and that Fintree is in Australia. (Compl. ¶¶ 2–3). The Complaint does not identify any injury suffered in New York, nor allege facts suggesting that the non-New York Defendants could have anticipated New York consequences arising from conduct involving an Ohio business and non-New York Plaintiffs. In short, the Complaint fails to identify a statutory basis for exercising personal jurisdiction over Viking and Messrs. Li, Wathne, or Tahir-Kheli.

### 3. Even if Plaintiffs alleged personal jurisdiction, exercising jurisdiction would offend due process

Even if Plaintiffs could identify a statutory basis for jurisdiction, which they cannot, due process requires that each of the non-New York Defendants have minimum contacts with New York such that maintaining suit here accords with traditional notions of fair play and substantial

justice. *See Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 568 (2d Cir. 1996). To determine whether jurisdiction is reasonable, courts evaluate five factors: (1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effect relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies. *Id.*

Here, each of these factors weigh against exercising jurisdiction. The alleged business, facility, and contemplated transaction concern Ohio; Viking is alleged to be based there; Messrs. Li and Wathne are alleged to reside in China; Mr. Tahir-Kheli is alleged to reside in Florida; and Plaintiffs are alleged to be based in California and Australia. (Compl. ¶¶ 2–5, 8–9). On the pleaded facts, New York has little interest in adjudicating a dispute centered elsewhere, while litigating here would impose a substantial burden on the non-New York Defendants. Accordingly, the Court should dismiss the claims against the non-New York Defendants for lack of personal jurisdiction.

### C. The Complaint Fails to State a Claim

To survive Rule 12(b)(6), a complaint must plead sufficient facts to state a plausible claim, not labels, conclusions, or a formulaic recitation of elements. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). The Court may consider documents incorporated by reference or integral to the Complaint, including the agreements on which Plaintiffs' contract claims necessarily rely. *See Cary Oil Co.*, 90 F. Supp. 2d at 407 n.19 (considering contract incorporated by reference into complaint which alleged breach of contract).

#### 1. Ohio law governs this dispute

Before addressing the merits of Plaintiffs' claims, the Court must determine which state's substantive law applies. Under New York choice-of-law principles, the Court must first determine whether an actual conflict exists between the laws of the relevant jurisdictions. *See Verzani v.*

*Costco Wholesale Corp.*, 641 F. Supp. 2d 291, 298 (S.D.N.Y. 2009). If such a conflict exists, a federal court sitting in diversity applies New York's choice-of-law rules. *See id.*

Here, a genuine conflict exists. The parties' dispute centers on alleged entitlement to compensation arising from efforts to facilitate the financing or sale of Viking. New York's Statute of Frauds expressly bars claims for compensation arising from services rendered in negotiating the sale of a business opportunity unless memorialized in a writing subscribed by the party to be charged. *See* N.Y. Gen. Oblig. Law § 5-701(a)(10). Ohio law contains no comparable prohibition. *See* Ohio Rev. Code § 1335.05. Because application of New York and Ohio law could produce materially different outcomes, a true conflict exists.

The unexecuted Draft Fintree Agreements each contain Ohio choice-of-law provisions. Ordinarily, New York courts will enforce a contractual choice-of-law clause where the chosen jurisdiction bears a reasonable relationship to the transaction and enforcement would not offend public policy. *See Int'l Minerals & Res., S.A. v. Pappas*, 96 F.3d 586, 593 (2d Cir. 1996). Here, however, Plaintiffs' claims depend upon the proposition that Viking became bound by agreements it never executed. If, as Defendants contend, no executed agreement exists, then the purported choice-of-law provisions cannot independently determine the governing law.

Even without relying on those provisions, Ohio law plainly governs under New York's interest-analysis framework. In determining which jurisdiction possesses the greatest interest in the dispute, courts consider: (a) the place of contracting; (b) the place of negotiation; (c) the place of performance; (d) the location of the contract's subject matter; and (e) the domicile, residence, nationality, place of incorporation and places of business of the parties. *Philips Credit Corp. v. Regent Health Group, Inc.*, 953 F. Supp. 482, 501 (S.D.N.Y. 1997).

The relevant factors overwhelmingly point to Ohio. The first factor is of limited utility because the existence of a contract is itself disputed. Likewise, the Complaint does not identify where any negotiations occurred, alleging only that draft agreements were transmitted electronically to Mr. Tahir-Kheli in Florida. The remaining factors, however, strongly favor Ohio.

Most significantly, the subject matter of the parties' alleged engagement was Viking itself, including the financing and potential sale of its approximately 380,000-square-foot data-center facility located in Ohio. Any financing, transaction, or sale that Plaintiffs claim to have facilitated necessarily concerned an Ohio-based business and Ohio-based assets. The center of gravity of the dispute is therefore Ohio, not New York.

The parties' locations further reinforce that conclusion. Viking operates from Ohio, while Plaintiffs are Delaware and Australian entities. No party is alleged to be headquartered in New York, and the Complaint identifies no New York nexus to the underlying transaction. Under these circumstances, Ohio has the most substantial interest in the controversy, and its law should govern.

Accordingly, the Court should apply Ohio substantive law in determining whether Plaintiffs have stated any viable claim for relief.

### 2. No claim is adequately pled against the Individual Defendants

The Complaint fails to state any claim against the Individual Defendants. Other than identifying where they reside, the Complaint contains virtually no non-conclusory factual allegations concerning Mr. Li, Soffia Wathne, Anna Wathne, or Stefan Wathne. As to Mr. Tahir-Kheli, the Complaint alleges only a handful of acts which were undertaken in his capacity as Viking's Chief Operating Officer and in connection with the parties' discussions concerning the LOU and the unexecuted Draft Fintree Agreements. (Compl. ¶¶ 28, 30–31, 36, 38, 52–53). Those allegations relate to Viking's purported obligations and do not give rise to personal liability.

The defect is particularly apparent with respect to Counts I–IV. Each claim is predicated on alleged contractual or quasi-contractual obligations purportedly owed by Viking. The Complaint does not allege that any Individual Defendant was a party to either proposed agreement, personally guaranteed Viking's obligations, assumed liability for Viking's conduct, or operated as Viking's alter ego. Nor does it identify any theory under which an individual could be held liable for obligations allegedly arising from agreements to which only Viking was purportedly a party.

To the extent Plaintiffs intend to assert these claims against the Individual Defendants, the Complaint never explains who supposedly did what, when they did it, or why they may be held personally liable. Such undifferentiated allegations are the hallmark of impermissible group pleading and fall well short of Rule 8's basic pleading requirements. *See Atuahene v. City of Hartford*, 10 F. App'x 33, 34 (2d Cir. 2001) (affirming dismissal where the complaint "lump[ed] all the defendants together" without distinguishing their conduct).

Count V fares no better. Although it nominally refers to "Defendants," it likewise fails to identify any specific fraudulent statement, omission, or conduct attributable to any Individual Defendant. (Compl. ¶¶ 82–87). As discussed below in Section II.C.6, the claim independently fails under Rules 9(b) and 12(b)(6). Accordingly, the Complaint fails to state any claim for relief against the Individual Defendants and should be dismissed as to them in its entirety.

### 3. The Complaint fails to state a breach of contract claim (Count I)

Count I, for breach of contract, appears to be asserted against Viking only.[2] At the outset, the claim is premature because the Complaint does not allege a completed financing or sale that

---

[2] As addressed in Section II.C.2, *supra*, Counts I–IV do not contain any allegations against the Individual Defendants, and thus appear to be asserted against Viking only. And as to Count I for breach of contract, "[i]t goes without saying that a contract cannot bind a nonparty." *Three-C Body Shops, Inc. v. Nationwide Mutual Fire Ins. Co.*, 81 N.E.3d 499, 503 (Oh. Ct. App. 2017)

triggered any such fee. A breach of contract claim "does not accrue until all the elements of the claim have been met." *Weckel v. Cole + Russel Architects, Inc.*, 255 N.E.3d 221, 233 (Oh. Ct. App. 2024). Here, Plaintiffs seek $18,000,000 in compensatory damages, allegedly owed to them as a "success fee" for the anticipated sale of Viking, but they do not allege that the sale has actually occurred. Nor can they. And under the purported contracts, Plaintiffs are not entitled to any success fee unless and until Viking is sold. (*See* Wathne Decl., Exs. B, C, § 5.3 ("Fintree shall be entitled to a commission equal to five percent (5%) of the total consideration or enterprise value … paid or deemed paid in connection with any [sale]."')).[3] As such, no breach has occurred, and Plaintiffs' claims are not yet ripe. *See Profeta v. Shandell, Blitz, Blitz*, 2015 WL 7288651, at *3 (S.D.N.Y. Nov. 16, 2015) ("[Defendant] has not yet failed to perform, so any contractual claim would be 'premature.'" (citation omitted)).

Plaintiffs also allege unpaid monthly retainers. That separate allegation does not cure the Complaint because Plaintiffs do not plausibly identify an enforceable agreement governing the claimed six-month retainer obligation or plead facts establishing the particular unpaid retainers and contractual terms on which recovery rests.

**a. The Complaint does not plead facts establishing that a Consulting Success Fee became due under the LOU**

The LOU relates only to the "Capital Raise Goal" of "securing the amount of Forty Million USD ($40,000,000)," which "may be met in the form of equity, debt or a hybrid of equity and debt." (Wathne Decl., Ex. A, §§ 1.3, 1.3.1). Stealth is entitled to a success fee of 5% "of all capital

---

(citation omitted). None of the Individual Defendants are alleged to be parties to any of the contracts; and none of them are.

[3] As addressed below in Section II.C.3.a, by its plain terms, the Success Fee Tail in the LOU applies only in the event of an equity or debt fundraise; it does not apply in the event of a sale of Viking.

introduced as equity" through a capital raise (the "Consulting Success Fee"). (*Id.*, § 2.2(i)). And under the "Success Fee Tail," Stealth is entitled to the Consulting Success Fee for any capital raised within twelve months following the Engagement Term. (*Id.*, § 2.2(iii)).

The LOU, as described in the Complaint and reflected in the LOU itself, compensates Stealth for qualifying equity or debt capital introduced through Stealth. The Complaint does not allege that Stealth introduced the source of any qualifying capital, that a qualifying financing closed, or that any capital inured to Viking's benefit within the contractual tail period as a result of Stealth's introduction. Nor does it allege facts bringing the asserted transaction within the LOU's fee language rather than its exclusion for capital procured from Viking's independently cultivated relationships. Accordingly, the Complaint does not plead a contractual trigger for Stealth's claimed $15 million fee.

For these reasons, the Complaint fails to allege breach of the LOU.

**b. The Complaint does not allege that Viking consented to the Draft Fintree Agreements**

"In order to declare the existence of a contract, the parties to the contract must consent to its terms, there must be a meeting of the minds of both parties, and the contract must be definite and certain." *McSweeney v. Jackson*, 691 N.E.2d 303, 308 (Oh. Ct. App. 1996). However, the Complaint does not allege that Viking consented to the Draft Fintree Agreements' terms.

At the outset, Plaintiffs acknowledge that they wrote the Draft Fintree Agreements and that those agreements "evolved" well beyond the LOU to include "enterprise sale strategy, M&A advisory, valuation, engineering, advisor selection, and transaction structuring." (Compl. ¶¶ 18, 39). *Fintree's* expansive responsibilities under the Draft Fintree Agreements go well beyond *Stealth's* responsibilities in the LOU, and are certainly not "the same terms and conditions" that were contained in the LOU. (Ex. A, § 3). It thus is no surprise, as the Complaint acknowledges,

that Viking never signed the Draft Fintree Agreements. Given the "function of a signature on a contract is to indicate that the signor has accepted the terms of the contract," *Young v. Glaze*, 643 N.E.2d 186, 189 (Oh. Mun. Ct. 1994), the inverse must also be true: that a party's refusal to sign a contract indicates that they have not accepted the terms of the contract. Here, the Complaint's own allegations do not plausibly establish mutual assent to the material transaction—fee terms—as the parties continued discussing the proposed agreement, Fintree sent a revised version containing materially different commission language, and the Complaint does not identify any communication in which Viking accepted either version's transaction-fee provisions.

Seeking to avoid this hurdle, Plaintiffs allege that the parties "performed under the agreement[s] as if [they] had been signed." (Compl. ¶ 24). But that is not plausible. Plaintiffs assert that, on January 29, days before being sent the February Draft, Mr. Tahir-Kheli agreed, on behalf of Viking, to pay Fintree a monthly retainer because Viking "[a]ppreciate[d] [Plaintiffs] working tirelessly in the background on our behalf *as we figure out how best to proceed*." (Compl. ¶ 28 (emphasis added)). But that allegation does not support a plausible inference that, before even receiving the February Draft (dated February 2, 2026), Viking agreed to be bound by its terms. Likewise, Plaintiffs allege that, once Viking actually received the February Draft, Viking requested a call "to walk through the [draft agreement] and your perspectives on what we should be doing next?" (Compl. ¶ 30). But that is far from the "manifestation of assent by the offeree [that] constitutes the acceptance" of a contract under Ohio law. *McSweeney*, 691 N.E.2d at 308. Finally, the fact that Fintree sent a proposed new agreement that revised the previous agreement, which was unsigned by Viking, is clear evidence that Viking did not enter into the February Draft. *See Hairston v. Goodman*, 1991 WL 39715, at *5 (Oh. Ct. App. Mar. 21, 1991) ("Plaintiff presented no evidence to refute defendants' assertion they did not assent to the inserted alteration.").

Likewise, the Complaint's allegations demonstrate that Viking did not enter into the March Draft. Specifically, Plaintiffs admit that Viking never responded to Plaintiffs' email sending that agreement. (Compl. ¶ 41). That immediately sinks Plaintiffs' claim. *See Nilavar v. Osborn*, 738 N.E.2d 1271, 1285 (Oh. Ct. App. 2000) ("Generally, silence in response to an offer will not constitute an acceptance of the offer.").

At bottom, the Complaint contains one allegation that purportedly demonstrates Viking's agreement to enter into one of (or both) of the unexecuted Draft Fintree Agreements: that Viking paid Fintree a $10,000 monthly retainer in each of March and April 2026. (Compl. ¶ 34). But that allegation alone does not give rise to a plausible inference that Viking assented to the Draft Fintree Agreements. Rather, Plaintiffs allege that, in early February (while the LOU, with its stated purpose of raising capital in the form of equity or debt, was still operative), Viking "determined that they would move forward with a $3 Million loan to be provided by Initium Capital." (*Id.* ¶ 32). "Shortly thereafter, Viking sent payment to Fintree in early February 2026." (*Id.* ¶ 33). Plaintiffs then allege that "[t]hroughout the month of April 2026, there were more calls and advice provided to Viking relating to possible loans and potential sales." (*Id.* ¶ 46). And "[o]n April 25, 2026, Viking instructed Fintree to continue its work related to" the potential loan from Initium Capital. (*Id.* ¶ 47). Plaintiffs assert that Viking paid Fintree $10,000 in March and again in April. (*Id.* ¶ 51). However, at the end of April, only after "Fintree ***discovered*** that there was pending an imminent sale of Viking," Fintree "delivered a written summary" purportedly covering the "expanded scope" of its engagement, "transaction strategy, and "path forward." (*Id.* ¶¶ 48–49 (emphasis added)). There is no allegation that Viking proceeded with a loan from Initium, or that Plaintiffs found the potential buyer of the "imminent" sale that they "discovered" after the fact.

"Determining whether the complaint states a plausible claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Barrett v. Forest Labs., Inc.*, 39 F. Supp. 3d 407, 425 (S.D.N.Y. 2014). Common sense, combined with the Complaint's allegations, demonstrate that Plaintiffs are attempting to backdoor their way into binding Viking to the unexecuted Draft Fintree Agreements. But the Complaint does not allege that Viking consented to the terms of either of the unexecuted Draft Fintree Agreements, and thus Plaintiffs have failed to allege the existence of a valid and binding contract.

**c. The Complaint does not allege a meeting of the minds**

The Complaint fails to state a claim for breach of contract for the additional reason that the March Draft contains an inconsistency that is different from the terms of the February Draft, and thus demonstrates that the parties never reached an agreement. Specifically, the Commission Framework in the March Draft provides that "Fintree shall in all circumstances receive not less than two percent (1%) [sic] of Transaction value," and that "Viking agrees that aggregate commissions may increase up to a maximum of seven percent (6%) [sic]." (Wathne Decl., Ex. C, § 6.2). The February Draft, on the other hand, provides that Fintree would receive not less than "two percent (2%) of Transaction value," and that the aggregate commissions may increase up to a maximum of "seven percent (7%)." (*Id.*, Ex. B, § 6.2). These differing terms between the agreements demonstrate that Fintree and Viking never reached agreement on the applicable commission structure, a core component of the proposed agreements. *See Hairston*, 1991 WL 39715, at *4–5 (holding that there "must be a meeting of the minds as to every essential term of the contract," and that the change plaintiff made in the purchase agreement "did not show a concluded contract since the evidence establishes no meeting of the minds"). For these reasons, the Complaint fails to state a claim for breach contract.

#### 4. Counts II and III fail to state a claim for quantum meruit and unjust enrichment

Counts II and III seek the same $18.06 million demanded under the contract count.[4] To the extent Plaintiffs rely on an enforceable agreement, equitable recovery is unavailable for the same subject matter. Plaintiffs may plead equitable theories in the alternative, but their allegations must still plausibly support each element of those theories. *See TruLogic, Inc. v. General Electric Co.*, 177 N.E.3d 615, 635 (Oh. Ct. App. 2021) (holding that a claim for unjust enrichment can be pled "as an alternative remedy even where an express contract" exists). Here, they do not.

"A claim for quantum meruit shares the same essential elements as a claim for unjust enrichment, and both doctrines are equitable doctrines." *See Three-C Body Shops*, 81 N.E.3d at 506 (citation omitted). Both claims require Plaintiffs to allege "(1) a benefit conferred on the defendant by the plaintiff; (2) knowledge by the defendant of the benefit; and (3) retention of the benefit by the defendant that would be unjust without payment to the plaintiff." *Id.* Plaintiffs do allege that they supplied advice and that Viking received certain work product. (Compl. ¶¶ 31–32, 36–38). But those allegations do not describe a legally significant benefit conferred, nor do they plausibly allege that Viking retained benefits having a reasonable value of $18.06 million without payment.

As to the former, Plaintiffs allege that "as a result of [their] consulting advice, Kaz determined that they would move forward with a $3 Million loan to be provided by Initium Capital." (Compl. ¶ 32). But Plaintiffs do not allege that a loan with Initium actually closed; instead, they assert that they discovered a purported imminent sale of Viking. (*Id.* ¶ 48). Plaintiffs next allege that they "provided a detailed analysis on Kaz's options and outlined action items that

[4] *See* Section II.C.2, *supra*, discussing how Counts I–IV do not include any allegations or claims against the Individual Defendants.

needed to be performed." (*Id.* ¶ 37). They further assert that the parties "discussed in detail the differences between possible sales to Cushman and Wakefield and Oberon," but that Plaintiffs advised Viking "to consider Oberon even though the sale process may be a bit longer." (*Id.* ¶ 38). Plaintiffs do not connect how their advice, which Plaintiffs acknowledge Viking did not act on (*see* Compl. ¶ 48), somehow constituted a "benefit" to Viking.

Relatedly, Plaintiffs do not allege "retention of the benefit by the defendant that would be unjust without payment to the plaintiff." *Three-C Body Shops*, 81 N.E.3d at 506. Indeed, the Complaint alleges that only *after* Plaintiffs "discovered that there was pending an imminent sale of Viking," did Plaintiffs (days later) deliver "a written summary covering … transaction strategy." (Compl. ¶¶ 48–49). The Complaint otherwise contains only a conclusory assertion that, also after "discovering" the potential sale, "Fintree delivered additional advisory work product which Viking accepted and retained." (*Id.* ¶ 50). But the Complaint does not bridge the gap to connect Plaintiffs' after-the-fact "work product" with Viking's sale. Nor does the Complaint allege that Plaintiffs had anything to do with the potential buyer for Viking's "imminent sale."

At bottom, the claimed amount of damages largely tracks the contingent transaction fees sought under Plaintiffs' contract theory, notwithstanding the Complaint's failure to allege that a financing or sale closed, that Plaintiffs introduced the relevant counterparty, or that their advice generated a completed transaction. The Complaint supplies no nonconclusory facts explaining how the services actually retained had the extraordinary reasonable value claimed. Thus, the Complaint does not allege that Viking retained any benefit whatsoever, let alone that it would be unjust for Viking to retain that purported benefit without payment to Plaintiffs. For these reasons, Counts II and III fail to state a claim and must be dismissed.

### 5. Count IV fails to state a claim for promissory estoppel

Plaintiffs' promissory estoppel claim appears to be asserted against only Viking,[5] and is premised on Viking's claimed "clear and unambiguous promise to pay Plaintiffs for their services pursuant to the Fintree Agreement." (Compl. ¶ 78). At the outset, the claim should be dismissed because it is duplicative of Plaintiffs' breach of contract claim, and Plaintiffs do not plead it in the alternative. *See Assemblage Entertainment Pvt. Ltd. v. 41 Entertainment, LLC*, 2025 WL 2776657, at *6 (D. Conn. Sept. 29, 2025) (dismissing promissory estoppel claim because "Plaintiff has failed to plead its promissory estoppel claim alternatively").

Additionally, the Complaint fails to allege any substantive factual allegations, and merely recites the elements of a claim for promissory estoppel. (*Compare* Compl. ¶¶ 77–80, *with Dailey v. Craigmyle & Sons Farms*, L.L.C., 894 N.E.2d 1301, 1306 (Oh. Ct. App. 2008) (reciting elements of promissory estoppel)). But Plaintiffs' "obligation to provide the 'grounds' of [their] 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do." *Twombly*, 550 U.S. at 545; *Edwards v. Sequoia Fund, Inc.*, 938 F.3d 8, 12 (2d Cir. 2019) ("[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." (citation omitted)). The court is "not required to credit conclusory allegations or legal conclusions couched as factual allegations." *Id.* (cleaned up).

Even assuming the Complaint alleges any facts, as opposed to the mere elements of a claim, the Complaint does not allege any legally significant facts that state a claim for promissory estoppel. Specifically, the Complaint does not sufficiently plead "a clear and unambiguous promise." *See Bless v. HomeWAV, LLC*, --- N.E.3d ---, 2026 WL 1379759, at *3 (Oh. Ct. App. 2026) ("For a promissory estoppel claim to succeed, 'the threshold element of a promise must be

[5] *See* Section II.C.2, *supra*.

met.'" (citation omitted)). "A clear and unambiguous promise is one that is definite in the sense of being clearly a promise and not just a statement of intentions." *Id.* The Complaint fails in this regard. It alleges only, in wholly conclusory fashion, that "Defendant made a clear and unambiguous promise to pay Plaintiffs for their services pursuant to the Fintree Agreement." (Compl. ¶ 78). But the Complaint does not identify who made that promise, or when, or even which Fintree Agreement the purported promise relates to. Nor is a purported promise to pay Plaintiffs "for their services" clear and unambiguous—what were those services, how were they purportedly performed under either of the Draft Fintree Agreements, and how did Defendants clearly and unambiguously promise payment? *See Williams v. U.S. Bank Shaker Square*, 2008 WL 802523, at *2 (Oh. Ct. App. Mar. 27, 2008) (holding that "alleged comment about the loan being a 'done deal' did not constitute 'a clear and unambiguous promise'"). For these reasons, the Complaint fails to allege a claim for promissory estoppel.

### 6. Count V fails to state a claim for fraudulent misrepresentation

Finally, the Complaint asserts a claim against all Defendants for fraudulent misrepresentation. Like the others, Count V fails to state a claim for relief and should be dismissed.

First, Rule 9(b) requires Plaintiffs to state the circumstances of alleged fraud with particularity. Fed. R. Civ. P. 9(b); *Rombach v. Chang,* 355 F.3d 165 (2d Cir. 2004). The Complaint must identify the allegedly false statements or omissions, the speaker, when and where each statement was made, explain why it was false when made, and plead a plausible causal connection between the alleged fraud and a cognizable injury. *Pilkington North America, Inc. v. Mitsui Sumitomo Insurance Co. of Am.*, 420 F. Supp. 3d 123, 141 (S.D.N.Y. 2019). Count V does none of these things. It alleges that "Defendants" made "many false misrepresentations" concerning Viking's management, alleged beneficial ownership, and an alleged SEC filing, and that they

represented Viking as "law-abiding." (Compl. ¶¶ 82–83). But it identifies no statement by any particular defendant, no time or place, no recipient, no facts showing falsity when made, and no basis for treating a generalized statement that a company is "law-abiding" as an actionable factual representation. *See Atuahene*, 10 Fed. App'x at 34 (addressing impermissible "lumping [of] all the defendants together in each claim and providing no factual basis to distinguish their conduct").

Second, the omission theory fails independently. The Complaint does not identify a relationship creating a duty to disclose, a particular omission that rendered a prior statement misleading, or facts establishing that Plaintiffs would not have provided the identified services but for the omission. *See Addison Holdings, LLC v. Fox, Byrd & Co.*, 203 N.E.3d 1259, 1282 (Oh. Ct. App. 2022) (addressing the six elements of a successful intentional misrepresentation claim). Plaintiffs' claimed injury—unpaid contract and transaction compensation—is the same economic injury asserted in Counts I–IV, not a distinct injury caused by reliance on a particular misrepresentation. Count V should be dismissed under Rules 9(b) and 12(b)(6).

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court dismiss the Complaint in its entirety.

Dated: New York, New York
September 21, 2026

**K&L GATES LLP**

By: */s/ Joanna A. Diakos*

Joanna A. Diakos
Alexander D. Walsdorf
599 Lexington Avenue
New York, New York 10022
(212) 536-3900
joanna.diakoskordalis@klgates.com
alex.walsdorf@klgates.com

*Attorneys for Defendants*